UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

TOTAL SPORTS RESOURCES, LLC
and FOREIGN RESOURCES CORPORATION,

                Plaintiffs,

           -against-

HARTWELL INDUSTRIES, INC.,

                Defendant.
------------------------------------------------------------x

08 Civ.

COMPLAINT

JUN 3 0 2008

              Plaintiff, by its attorneys, Kalnick, Klee & Green, LLP, as and for its complaint, states:

        1.    At all times hereinafter mentioned, plaintiff, Total Sports Resources, LLC, was and still is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

        2.    At all times hereinafter mentioned plaintiff, Foreign Resources Corporation, was and still is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

        3.    Upon information and belief, at all times hereinafter mentioned, defendant, Hartwell Industries, Inc., was and still is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Hartwell, Georgia.

        4.    The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## COUNT III

18.    Plaintiff, Total Sports Resources, LLC, repeats and realleges each and every allegation contained in paragraphs 1 through 11, inclusive, hereof as though herein set forth in full.

19.    On or about April 18, 2007, July 30, 2007, August 29, 2007, September 28, 2007, December 3, 2007, December 10, 2007, December 17, 2007, February 20, 2008, April 15, 2008 and May 27, 2008, an account was stated between plaintiff Total Sports Resources, LLC and defendant and upon such statement, a balance of $79,830.77 was found to be due from defendant to plaintiff, which account was delivered, received, accepted and retained by defendant without objection being made thereto or to any item thereof.

20.    No part of the amount due has been paid, and there is now due from defendant to plaintiff, Total Sports Resources, LLC, the sum of $79,830.77, with interest from April 18, 2007.

## COUNT IV

21.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 20, inclusive, hereof as though herein set forth in full.

22.    On or about April 15, 2008 and May 27, 2008, an account was stated between plaintiffs and defendant and upon such statement, a balance of $441,280.90 was found to be due from defendant to plaintiffs, which account was delivered, received, accepted and retained by defendant without objection being made thereto or to any item thereof.

23.    No part of the amount due has been paid, and there is now due from defendant to plaintiffs the sum of $441,280.90, with interest from April 15, 2008.

WHEREFORE, plaintiffs request judgment against defendant, as follows:

i.    On Count I, in the sum of $79,836.77, with interest from April 18, 2007;

ii.    On Count II, in the sum of $361,450.13, with interest from December 1, 2007;

iii.    On Count III, in the sum of $79,830.77, with interest from April 18, 2007;

iv.    On Count IV, in the sum of $441,280.90, with interest from April 15, 2008;

and

v.    For such other and further relief as the Court may deem just and proper, including the costs and disbursements of this action.

Dated: New York, New York
       June 24, 2008

KALNICK, KLEE & GREEN, LLP

By: _Allen Green_

Allen Green, Esq. (AG 4246)
Attorneys for Plaintiff
767 Third Avenue
New York, New York 10017
(212) 751-2400

C:\GREEN\FOREIGN\HARTWELL\COMPLAINT 6-23-08.wpd

-5-

# EXHIBIT A

# TOTAL SPORTS RESOURCES

500 7TH AVENUE - 5TH FLOOR
NEW YORK, NY 10018
TEL: 212-840-3600
FAX: 212-840-0613

## BUYING AGENCY AGREEMENT

This agreement made this __8/17/2005__ by and between _
HARTWELL INDUSTRIES having its principal office at __97__
WINFIELD CIRCLE, HARTWELL,GA 30643
Hereinafter referred to as "Buyer" and TOTAL SPORTS RESOURCES having its
principal office at **500 7TH AVENUE, NEW YORK, NY 10018** hereinafter referred to
as "Agent".

WHEREAS, Buyer desires to continue to engage the services of TOTAL
SPORTS RESOURCES , as its non-exclusive buying agent in certain transactions, and
TOTAL SPORTS RESOURCES desires to act in that capacity.

NOW, THEREFORE, it is agreed that to the extent such services are requested
and thereafter rendered to the Buyer by the Agent, such services shall be rendered strictly
in accordance with the terms of this agreement.

1.  Buyer hereby appoints Agent as its buying agent **worldwide**, effective
    with the date written above, to continue until the expiration of thirty days
    from the date of mailing by either party to the other at any time, by
    registered mail, of notice of cancellation. Agent hereby accepts this
    appointment, and agrees to act as same according to the terms and
    conditions as set forth in this agreement.

2.  The Agent agrees that with respect to the merchandise to be procured
    hereunder it will:

1

TOTAL SPORTS RESOURCES

    a.    in no case act as a seller, but on each and every purchase made by the Buyer, will act only as a shipper and Agent;

    b.    visit manufacturers in its appointed area, collect samples, submit these samples to the Buyer and shall regularly report to the Buyer the market situation and availability of merchandise and obtain price quotes at which the various items of merchandise which it handles for the buyer can be purchased;

    c.    place orders on behalf of the Buyer with manufacturers. The Agent shall maintain contact with such manufacturers, expedite the Buyer's orders, verify that the quantity, quality and condition of the merchandise corresponds to the contract specifications, inspect finished products prior to packing to ascertain that the merchandise meets the specifications, quality and packaging as required in Buyer's purchase order or other duly executed written instructions, and follow-up to make sure that the merchandise is produced and shipped according to schedule;

    d.    exercise no control of the price of such merchandise, except to negotiate the lowest possible price for the benefit of the Buyer;

    e.    retain evidence in the form of invoices and other receipts from the manufacturers of the merchandise, available to submit to the Buyer immediately upon request, to verify the amounts which are shown on the export invoices;

    f.    advise the manufacturers that they will be selling merchandise directly to Buyer and that Agent will be acting as Agent in these transactions; and

    g.    buy and hold "quota" on behalf of Buyer for use by Buyer in entering merchandise into the commerce of the United States.

3.    The Agent certifies that it will not furnish to the manufacturers, any dies, molds, patterns, art work, printing plates, engineering work, labor, financial assistance or otherwise assist in production of the goods without the advance approval of the Buyer, so that the cost of such items may be fully and properly disclosed on the invoice covering the purchased merchandise.

## TOTAL SPORTS RESOURCES

4.  The Agent in executing this agreement certifies that it has no ownership interest in, or any control of, or any financial interest in factories making the commodities, goods or merchandise, and shall not share its commissions paid by the Buyer hereunder with any manufacturer and shall not receive or accept any remuneration from and manufacturer with which Agent deals on behalf of Buyer.

5.  Agent shall be responsible for all expenses incurred in connection with the performance of its services hereunder, including, by way of example, telephone expenses, rental expenses, and any other sales, advertising, promotional or operational expenses.

6.  The Agent shall sign a certificate of inspection confirming that the merchandise identified on the invoice(s) for each shipment was personally examined by the Agent while in process and was produced by the manufacturer at the address and country shown on the shipping documents.

7.  Agent represents to Buyer that Agent is serving as a buying agent pursuant to this agreement and Agent is not functioning as a principal; Agent further represents that the aforesaid "buying commission" is a true commission and the Agent shall not take any action, the effect of which would be to result in such buying commission being or becoming part of the dutiable cost of the goods purchased by Buyer with Agent's assistance as herein provided. Agent shall indemnify Buyer against expenses and liabilities incurred by Buyer on account of any misrepresentation or default by Agent under the provisions of the preceding sentence.

8.  In consideration of such services as may from time to time be provide to the Buyer by the Agent, the Buyer agrees:

    a.  To pay the Agent  8% . This payment shall be separately invoiced by the Agent and shall become payable upon receipt of Agent's invoice. The amount of this commission is subject to change by written mutual agreement.

3

TOTAL SPORTS RESOURCES

b.  To have the full responsibility for disclosing the terms of this agreement and the payment of commissions thereunder to the appropriate United States Customs authorities.

9.  This agreement constitutes written expression of the oral buying agency agreement under which Buyer and Agent have operated in the past.

10. This Agreement has been executed in accordance with, and shall be governed by, the laws of the State of New York, United States of America.

HARTWELL CORPORATION

By: _____

KUZMOWYCZ MICKEL

DIRECTOR OF SOURCING

DATE: 9/1/05

TOTAL SPORTS RESOURCES

_____

JASON KRA, PRESIDENT

DATE: 8/16/05

4

# EXHIBIT B

*Hartwell*

*A 9AMF*

## EXCLUSIVE DISTRIBUTOR AGREEMENT

*12-11-05*

This Exclusive Distributor Agreement ("Agreement") is entered into as of ~~October~~ __,
2005 (the "Effective Date"), by and between **Hartwell Industries, Inc.**, a Delaware corporation,
located at 97 Winfield Circle, Hartwell, Georgia 30643 ("Hartwell"), and **Total Sports
Resources**, a division of **Foreign Resources Corporation**, a _____ corporation with
offices located at 500 7th Ave 5th floor New York, NY 10018  (the "Company").

## RECITALS

WHEREAS, Hartwell purchases and resells promotional products manufactured by
various companies to its customers;

WHEREAS, Company, a manufacturer of athletic apparel, desires to manufacture athletic
apparel that will be designed to Hartwell specifications and marketed by Hartwell;

WHEREAS, Hartwell has the capacity to decorate the manufactured athletic apparel
according to the needs of its customers; and

WHEREAS, Company desires that Hartwell customize, market and resell the
manufactured athletic apparel pursuant to the terms of this Agreement.

## AGREEMENT

NOW, THEREFORE, based on the foregoing and the terms and conditions set forth in
this Agreement, the parties agree as follows:

1.      Incorporation of Recitals.  The recitals stated above are hereby incorporated into this
Agreement.

2.      Exclusive Development and Appointment.  Company appoints Hartwell as Company's
exclusive distributor of co-developed athletic apparel products in the following market segments
in the Territory: (i) independent sporting goods retailers and team wholesalers; (ii) corporate
uniforms; (iii) independent embroiders and decorators; (iv) specialty industry accounts; and (v)
regional wholesalers and distributors. "Territory" means the United States of America, including
any territories of the United States and any branch of the United States military wherever located.
Company will make available exclusively to Hartwell the product mutually developed by
Company and Hartwell according to Hartwell's specifications that are listed in Exhibit "A" to this
Agreement (the "Products"), as such Exhibit may be amended from time to time by the mutual
written agreement of the parties.  In such capacity, Company will act and function as Hartwell's
buying agent for raw materials and supplies for the Products.

BRMFSLA 58041v3

3.    Acceptance. Hartwell accepts the appointment to sell the Products within the Territory, subject to the terms of this Agreement.

4.    Term. Unless terminated as hereinafter provided, the Agreement and the appointment of Hartwell hereunder will commence on the Effective Date and will continue for a period of three years (the "Initial Term"). Upon expiration of the Initial Term, Hartwell will have the option to extend this Agreement for additional one-year periods (each, a "Renewal Term") by providing written notice of Hartwell's election to renew this Agreement no less than sixty days prior to the expiration of the Initial Term or the then-current Renewal Term. As used in this Agreement, "Term" means the Initial Term and any Renewal Terms.

5.    Acceptance of Orders; Filling. All orders will be placed directly with Company, either through Company's EDI ordering system or as otherwise directed by the Company. Company will use commercially reasonable efforts to fulfill Hartwell's order prior to the fulfillment deadline agreed to by the parties at the time of such order. Notwithstanding the foregoing, Company will use commercially reasonable efforts to fulfill the accepted orders as promptly as practicable, subject, however, to delays caused by transportation conditions, labor or material shortages, strikes, riots, fires, supplier delays or any other cause beyond Company's control. In all cases, and without limitation of any of Hartwell's rights and remedies, Company will advise Hartwell in advance (i) if any Products are unavailable for delivery within the fulfillment period set forth herein; or (ii) of any inability to make full and timely delivery of any Products that Hartwell has previously ordered.

6.    Pricing and Payment.

    (a)    Hartwell will pay Company for its Products according to the schedule of prices included in Exhibit "A" to this Agreement. Company will do all that is within its power to hold the prices set forth in Exhibit "A" for a minimum of one year from the Effective Date. Thereafter, company shall make all effort to hold agreed prices for twelve month periods beginning with the initial purchase orders for the upcoming year. Price increases must be communicated before the acceptance of affected purchase orders.

    (b)    Hartwell will issue international letters of credits for all shipments and will be invoiced by the factories upon delivery to Hartwell's freight forwarder. Company shall act as buying agent for Hartwell and Company will be compensated at a commission rate of 8% of the FOB factory price. Payment by Hartwell to Company is due 45 days from the date of the invoice. Commission rates per product are detailed on Exhibit "A".

    (c) Parties agree to discuss and consider wire transfer payment for future orders.

2

7.   Sale and Promotion of the Products.

   (a)   Marketing/Promotion.   Hartwell will use commercially reasonable efforts to promote demand for the Products within the Territory.

   (b)   Customization.   Company acknowledges and agrees that Hartwell may decorate all Products by embroidering, attaching or otherwise affixing its customers' logos or other artwork or decoration prior to shipping to any Hartwell customer, and for such purposes and subject to the terms herein, Company grants to Hartwell a license to so modify the Products, provided that in no event will Company's name, logo or trademark be removed, covered, hidden or otherwise altered, without Company's prior consent.

   (c)   End-Customer Pricing.   Hartwell may determine its own pricing for the Products when reselling the Products to its customers.

   (d)   Product Availability.   Company will make certain that the Products are available to Hartwell for purchase under the terms hereof for a minimum of 1 year from the Effective Date (or from the date such Product becomes available for purchase under this Agreement, for any Products that are added at a later date), in quantities as determined by mutual agreement.

   (e)   Samples.   As soon as practicable following the Effective Date, Company will provide to Hartwell at no charge initial selection samples of Products as follows: (i) a minimum of 3 units of each style and color (one size) for new product review; and (ii) 1 unit of each style and color (one size) for photography samples.   For each additional Product added to this Agreement during the Term, Company will provide Hartwell with the same number of samples at no additional charge. Hartwell may purchase additional samples of any Products at a price not to exceed twice the cost of Company's FOB cost.

8.   Trademark Rights.

   (a)   During the Term and subject to the provisions of this Agreement, Company grants Hartwell a non-exclusive, royalty-free license to use, copy and display the Company trademark **Agame** ("Company Trademark") in connection with the branded label to be used exclusively by Hartwell: "Agame by Hartwell Athletic" (the "Branded Label") for the promotion, sale and distribution of the Products.

   (b)   Company represents and warrants to Hartwell that it has: (i) the legal right to use the Company Trademark; (ii) the right to grant Hartwell the right to use the Company Trademark in connection with the Branded Label as contemplated by this Agreement; and (iii) the full power, right and authority to enter into this Agreement and perform its obligations in connection herewith.   Company will indemnify Hartwell for any breach of Company's representations and warranties contained herein in accordance with Section 13.

3

(c)    Upon the expiration or earlier termination of this Agreement, Hartwell will discontinue use of Company Trademarks by the date all remaining Products are sold pursuant to Section 11(d), below.

(d)    Company retains all right, title and interest, including all copyright, patent, trade secret, trademark, and any other intellectual property rights, in and to Company's Products or Company Trademarks, including all updates, derivative works and modifications thereto (other than the modifications permitted hereunder for decoration purposes). Hartwell will gain no right, title or interest in Company Products or Company Trademarks by virtue of this license, other than the non-exclusive license granted hereunder.

(e)    Company has no right to use, copy or display any Hartwell trademarks apart from the limited right to manufacture and label products under the Branded Label for use by Hartwell as provided for in this Agreement.

9.    Quality Standards.    Hartwell will notify the Company of any claims for defective merchandise in writing. Company agrees to adhere to AQL 4.0 standards. Deposition of credited defective goods shall be at the discretion of the factory of origin.

10.    Shipment; Title.    Shipping will be FOB from Hartwell's designated freight forwarder. Hartwell will be the importer of record. Title and risk of Loss will pass to Hartwell upon delivery to Hartwell's freight forwarder.  Company will bear all costs of shipping and handling to Hartwell's designated freight forwarder and Company will maintain adequate insurance at least equal to Hartwell's purchase price of Products and will maintain adequate insurance for all risks as are customary in the industry, including risk of damage to the Products. Hartwell will bear all costs of shipping and handling from Hartwell's designated freight forwarder to its warehouse.

11.    Default/Termination.

(a)    Either party may terminate this Agreement if the other party breaches any material covenant, representation or warranty of this Agreement and such breach remains uncured 30 days following receipt of written notice from the non-breaching party.

(b)    Hartwell may terminate this Agreement upon thirty days prior written notice to Company in the event that Hartwell elects to discontinue offering the Products in Hartwell's then-current catalog for similar products.

(c)    In the event of termination, this Agreement will remain applicable to any orders for Products which Hartwell has placed and which Company has accepted prior to the effective date of termination.

4

(d)    In the event of termination or expiration of this Agreement, Hartwell may sell any remaining Products in its possession or control in accordance with the terms of this Agreement. Company will, at the request of Hartwell, provide Hartwell with reasonable assistance in selling off remaining inventory.

12.    Confidentiality.

(a)    Confidential Information. Either party (the "Receiving Party") may be exposed to or acquire information regarding the business, projects, operations, finances, activities, affairs, research, development, products, technology, technology architecture, business models, business plans, business processes, marketing and sales plans, customers, finances, personnel data, computer hardware and software, computer systems and programs, processing techniques and generated outputs, intellectual property, procurement processes or strategies, suppliers, or customers of the other party (the "Disclosing Party") or its or their respective directors, officers, employees, agents, suppliers, licensors or clients, including, without limitation, any idea, proposal, plan, procedure, technique, formula, technology, or method of operation (collectively, "Confidential Information"). Confidential Information will also include, without limitation, the terms and conditions of this Agreement.

(b)    Restrictions. The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence, to use such information for no purpose other than as necessary for the performance of its obligations and the exercise of its rights in accordance with this Agreement, and to make no disclosure of such information except in accordance with the terms of this Agreement. Each party hereby consents to the disclosure of its Confidential Information to the employees, officers, directors, agents, lenders, accountants, attorneys and auditors of the other party, and any entity controlling, controlled by or under common control with the other party, who have a need to know such Confidential Information. Each party further agrees to treat all Confidential Information of the other in the same manner as it treats its own confidential and proprietary information of similar sensitivity, but in no case will the degree of care be less than reasonable care. The Receiving Party will immediately advise the Disclosing Party of any actual or potential violation of the terms of this Section, and will reasonably cooperate with the Disclosing Party in relation thereto.

(c)    Exceptions.    Notwithstanding the foregoing, each party's confidentiality obligations hereunder will not apply to information which: (a) becomes publicly available without fault of the Receiving Party; (b) is rightfully obtained by the Receiving Party from a third party without restriction as to disclosure, or is approved for release by written authorization of the Disclosing Party; (c) is shown by written record to be developed independently by either party without use of the other party's Confidential Information; (d) is shown by written record to have been known or available to either party without restriction as to disclosure at the time of either party's receipt of such information; or (e) is required to be disclosed by law.  If either party receives a subpoena or other validly issued judicial process requesting, or is otherwise required by a government agency to disclose Confidential Information of the Disclosing Party, then the Receiving Party will promptly notify the disclosing party of such requirement, and before making any such required disclosure, will reasonably cooperate to seek confidential treatment or to obtain an appropriate protective order to preserve the confidentiality of the Confidential Information.

(d)    Injunctive Relief; Survival of Obligations.    The parties agree that, notwithstanding any other section of this Agreement, in the event of a breach or threatened breach of this Section, the non-breaching party will be entitled to seek equitable relief to protect its interests, including but not limited to preliminary and permanent injunctive relief, as well as money damages. Nothing stated herein will be construed to limit any other remedies available to the parties.  All obligations under this Section will survive for three years following the expiration or earlier termination of this Agreement.

13.    Representations and Warranties; Acknowledgement; Disclaimer.

(a)    General Representations and Warranties.    Each of the parties represents and warrants to other party that (i) it has the right, power and authority to enter into this Agreement; (ii) the execution, delivery and performance of this Agreement have been duly authorized and approved by it; (iii) this Agreement is a valid and binding agreement by it enforceable in accordance with its terms; and (iv) the individual signing this Agreement on its behalf has full authority to sign the Agreement and to bind it fully to the Agreement.

(b)    Company Representations and Warranties.    COMPANY REPRESENTS AND WARRANTS THAT ALL THE PRODUCTS IT SUPPLIES TO HARTWELL: (I) WILL BE MERCHANTABLE AND FIT FOR THEIR INTENDED PURPOSES AND ARE FREE FROM DEFECTS IN DESIGN, MATERIALS OR WORKMANSHIP; (II) WILL BE MANUFACTURED, MARKED AND PACKAGED IN CONFORMITY WITH ALL APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS; (III) DO NOT AND WILL NOT INFRINGE THE INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY; (IV) HAVE NOT BEEN MANUFACTURED USING CHILD LABOR OR PRISON LABOR; AND (V) CONFORM IN ALL MATERIAL RESPECTS TO THE SAMPLES OF SUCH PRODUCTS PROVIDED TO HARTWELL.

14.    Limitations of Liability.

6

BRMFSLA 58041 v3

(a)    NO CONSEQUENTIAL DAMAGES.  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOST PROFITS OR FOR ANY OTHER INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, OCCASIONED BY ANY BREACH UNDER THIS AGREEMENT OR ANY OTHER CAUSE WHATSOEVER, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)    LIMIT ON DIRECT DAMAGES.  IN NO EVENT WILL COMPANY'S LIABILITY TO HARTWELL FOR DIRECT DAMAGES UNDER THIS AGREEMENT EXCEED THE AMOUNTS PAID TO IT HEREUNDER.  IN NO EVENT WILL HARTWELL'S LIABILITY TO COMPANY FOR DIRECT DAMAGES UNDER THIS AGREEMENT EXCEED THE AMOUNTS OWED BY IT TO COMPANY HEREUNDER.

(c)    EXCEPTIONS TO LIMITATIONS OF LIABILITY.  THE LIMITATIONS OF LIABILITY IN THIS SECTION 14 WILL NOT APPLY TO A BREACH OF A PARTY'S (I) INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, OR (II) CONFIDENTIALITY OBLIGATIONS UNDER SECTION 12.

15.    Company Indemnification.  Company will indemnify, defend and hold Hartwell harmless from and against any third party claims, losses, demands, expenses or damages, of any kind or nature, arising from or related to (i) any breach by Company of any representation, warranty, covenant or obligation under this Agreement or (ii) Hartwell's use of the Products as contemplated under this Agreement; provided that Hartwell promptly notifies Company in writing of any such claim, promptly tenders the control of the defense and settlement of any such claim to Company (at Company's expense and with its choice of counsel), and cooperates fully with Company (at Company's reasonable request and expense) in defending or settling such claim, including but not limited to providing any information or materials reasonably necessary for Company to perform the foregoing.  Company will not enter into any settlement or compromise of any such claim without Hartwell's prior consent, which will not be unreasonably withheld.

16.    Governing Law; Jurisdiction.  This Agreement, and all the rights and duties of the parties arising from or relating in any way to the subject matter hereof, will be governed by, construed and enforced in accordance with, the laws of the State of Georgia, without regard to the choice of law or like rules of Georgia or any other jurisdiction.

17.    Proceedings.  Any dispute, controversy, or other proceedings arising out of or related to this Agreement, will be subject to the exclusive jurisdiction of the state and federal courts located in Atlanta, Georgia, and the parties hereby submit to the personal jurisdiction and venue of such courts.

7

BRMFSLA 5B041v3

18.    Miscellaneous.

(a)    Independent Contractors.    The relationship of the parties hereto is that of independent contractors. Nothing contained in this Agreement will be construed as creating a joint venture, agency, employment, or partnership relationship among the parties hereto nor will any party have the right, power, or authority to create any obligation or duty, express or implied, on behalf of any other party.

(b)    Binding; Assignment Limitations.    This Agreement will be binding on and inure to the benefit of each party hereto and such party's respective subsidiaries and affiliates, successors, and assigns. Either party may assign this Agreement, without the prior consent of the other party, to any entity that succeeds it by operation of law or via a change in material control.

(c)    Further Assurances.    Each party hereto agrees to execute and deliver any and all further documents, and to perform such other acts, as may be necessary or expedient to carry out and make effective this Agreement.

(d)    Waiver.    No delay on the part of any party in exercising any right, power, or privilege hereunder will operate as a waiver thereof, nor will any waiver on the part of any party of any right hereunder, nor any single or partial exercise of any rights hereunder, preclude any other or further exercise thereof or the exercise of any other right hereunder.

(e)    Force Majeure.    Neither party will be liable hereunder by reason of any failure or delay in the performance of its obligations (except for the payment of money) on account of strikes, shortages, riots, insurrection, terrorism, fires, flood, storm, explosions, earthquakes, Internet outages, acts of God, war, governmental action, or any other similar cause that is beyond the reasonable control of such party.

(f)    Notices.    Any notices to be given hereunder by either party to the other will be in writing and may be transmitted by personal delivery or by mail, registered or certified, postage prepaid with return receipt requested. Notices will be addressed to the parties at the addresses first written above, unless written notice in accordance with this Section is given changing that address. Notices delivered personally will be deemed communicated as of the date of actual receipt; mailed notices will be deemed communicated as of the third day following the date of postmark.

(g)    Modifications.    Any modification of this agreement will be effective only if it is in writing and signed by the party to be charged. No terms, provisions or conditions of any purchase order or other business form or written authorization used by a party, if any, will have any effect on the rights, duties or obligations of the parties hereto or otherwise modify this Agreement, regardless of any failure of either party to object thereto.

8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

Hartwell Industries, Inc.

By: _____

Its: VP Sales Hartwell Athletix

Address:

97 Winfield Circle
Hartwell, GA 30643
Phone: 706-856-4204
Fax: 706-856-4139

Foreign Resources Corporation

By: _____

Its: JASON KEA / OWNER

Address:

c/o Total Sports Resources
500 7th Ave 5th FL
New York NY 10018
Phone: (212) 240-3600
Fax: (212) 840-0603

10