FILED ELECTRONICALLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
TOTAL SPORTS RESOURCES, LLC                    :        No. 08 CV 5865 (MGC)
and FOREIGN RESOURCES CORPORATION,
                                               :        **AFFIDAVIT IN OPPOSITION**
                Plaintiffs,
                                               :        ECF
        -against-
                                               :
HARTWELL INDUSTRIES, INC.,
                                               :
                Defendant.
----------------------------------------------------------------x
STATE OF NEW YORK        )
                         )ss.:
COUNTY OF NEW YORK       )

        JERRY CHICHELO, being duly sworn, deposes and says:

        1.      I have been employed by plaintiff, Total Sports Resources, LLC, from June

of 1995 to the present as Executive Vice President. I am personally familiar with the material facts

hereof, and I am making this affidavit in opposition to defendant's motion to dismiss this action on

the grounds of an alleged forum selection clause.

        2.      On or about August 17, 2005, defendant entered into a "Buying Agency

Agreement" in writing with "Total Sports Resources". A copy of such Buying Agency Agreement

is annexed to the complaint as Exhibit A. Such Agreement was signed on behalf of defendant by

Michel Kuzmowycz, its director of sourcing. Pursuant to this Buying Agency Agreement, it was

agreed that Total Sports Resources, LLC would act as a buying agent for defendant Hartwell

Industries, Inc. (hereinafter "Hartwell") for all products of Hartwell on a worldwide basis. Such Buying Agency Agreement was prepared by Total Sports Resources, LLC and was negotiated and performed in New York, where Total Sports Resources has its principal office. Paragraph 1 of the aforesaid Agreement provides that it shall continue until the expiration of thirty (30) days from the date of mailing by either party to the other at any time, by registered mail, of notice of cancellation. No notice of cancellation was ever received, and accordingly, the Agreement remains in effect.

3.     On or about December 11, 2005, defendant Hartwell entered into an "Exclusive Distributor Agreement" (annexed to the complaint as Exhibit B), which was signed on behalf of Hartwell by Jody Tanner, its then vice president of sales, and by Jason Kra on behalf of Foreign Resources Corporation. Although the front page refers to the contracting party as "Total Sports Resources, a division of Foreign Resources Corporation", said Agreement was signed only by Foreign Resources Corporation.

4.     Contrary to the allegations in defendant's motion, Foreign Resources Corporation is not a wholly-owned subsidiary of Total Sports Resources, LLC; nor is Total Sports Resources a "division" of Foreign Resources Corporation. They are separate entities owned by the same family and operating out of the same address in New York.

5.     The Exclusive Distributor Agreement was prepared by defendant Hartwell, which simply took the form agreement which it had used with Liz Claiborne and adapted it. The Exclusive Distributor Agreement covered only the United States and only athletic apparel, whereby Hartwell was appointed as the exclusive distributor of Foreign Resources Corporation of co-

developed athletic apparel products in defined market segments. Such Exclusive Distributor
Agreement did not cover Hartwell's principal products such as outerwear. There was no intention
to supercede or change the Buying Agency Agreement. That is made clear by paragraph 18(l) of the
Agreement, upon which Hartwell now relies, stating that the Agreement supercedes all prior
agreements "with respect to the subject matter hereof." The fact is that the Buying Agency
Agreement and Exclusive Distributor Agreement are two separate agreements, covering different
subject matter. The Buying Agency Agreement clearly lacks any forum selection clause of any
nature.

　　　　　6.　　　The complaint herein, a copy of which is annexed hereto as Exhibit A,
contains four separate claims for relief. Thus, Count I is based upon the Buying Agency Agreement
and seeks to recover the sum of $79,836.77 for unpaid commissions pursuant thereto. Count II is
based upon breach of the Exclusive Distributor Agreement and seeks recovery of the sum of
$361,450.13, comprising failure to pay $86,450.13 for orders which Hartwell cancelled after fabrics
had been purchased, and $275,000.00 for Hartwell's orders which are ready overseas. Count III is
based on an account stated for the buying agency commissions specified in Count I, while Count IV
is based on an account stated for sums due pursuant to Counts I and II of the complaint.

　　　　　7.　　　The existence of yet another agreement (Exhibit B hereto), dated October 26,
2006, signed by Hartwell's then chief executive officer, Rick Cesere, should be noted, whereby Total
Sports Resources agreed to stock fabric at Hartwell's request in order to cut the production lead time;
this is part of the goods which are now overseas which Hartwell had ordered but which it has failed

to use. It can readily be seen that the October 26, 2006 agreement contains no forum selection clause.

     8.    The parties had a close and informal working relationship until Hartwell dismissed its chief executive officer, Rick Cesere. I do not believe that any of the parties were aware that the Exclusive Distributor Agreement contained a forum selection clause, which apparently was simply copied from another agreement.

     9.    Mr. Cesere was replaced in or about December 2007 by Hartwell as its chief executive officer. He was replaced by one Kevin McColgan. There never was a dispute with respect to the $79,830.77 owed for buying agency commissions; nor was there ever a dispute with respect to Hartwell's orders which were ready overseas on which Hartwell owes $275,000.00. With respect to cancelled orders, arising from Hartwell's decision to cancel its basketball uniform program utilizing Egyptian goods, the sum of $111,450.13 had been owing, but Mr. Cesere stated in a meeting on November 12, 2007 at my office in New York that Hartwell would uphold its obligations, as evidenced by its payment of the sum of $25,000.00 as a good faith gesture, and that the remainder would be worked out in conjunction with Hartwell's chief financial officer. Mr. Cesere was frank in stating that Hartwell had been experiencing financial difficulties. See email from Mr. Cesare to me of December 5, 2007, a copy of which is annexed hereto as Exhibit C, where Mr. Cesere stated that his financial officer was "arranging additional payments" and:

> "We are very tight right now because the season has been a bit of a dud and we have too much inventory and Patriarch is holding us to the fire. No problem, just a several week crunch. It is not that we do not want to clear this up quickly. I am sorry for the delay."

-4-

10.    When we met Hartwell's new chief executive officer, Kevin McColgan, on January 31, 2008, Mr. McColgan assured us that each of the above-mentioned items would be taken care of in a timely manner; however, in February, 2008, when we inquired when Hartwell will make payment as agreed to in our meeting, Mr. McColgan responded on February 15, 2008 with an email (Exhibit D hereto) stating that he wanted us to take back all of the merchandise Hartwell ordered because Hartwell was experiencing significant softening in demand because of the economy and because of excess inventory. We accordingly wrote to Patriarch Partners, LLC, in New York, New York, which is Hartwell's parent, on April 15, 2008, to demand payment (Exhibit E hereto), but received no response. Our attorney wrote a demand letter on May 27, 2008 prior to commencing this litigation (Exhibit F hereto), but he, too, received no response.

WHEREFORE, I respectfully request that defendant's motion be denied.

_____  8/5/08
JERRY CHICHELO

Sworn to before me this
5th day of August, 2008

_____
Notary Public

ALLEN GREEN
Notary Public, State of New York
No. 02GR4930718
Qualified in Westchester County
Commission Expires April 18, 2010

C:\GREEN\FOREIGN\HARTWELL\AFFIDAVIT OPPOSITION 8-4-08.wpd

-5-

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

TOTAL SPORTS RESOURCES, LLC
and FOREIGN RESOURCES CORPORATION,

             Plaintiffs,

        -against-

HARTWELL INDUSTRIES, INC.,

          Defendant.

-----------------------------------------------------------x

**COMPLAINT**

08 Civ. 5865

Plaintiff, by its attorneys, Kalnick, Klee & Green, LLP, as and for its complaint, states:

1.     At all times hereinafter mentioned, plaintiff, Total Sports Resources, LLC, was and still is a limited liability company duly organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

2.     At all times hereinafter mentioned plaintiff, Foreign Resources Corporation, was and still is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

3.     Upon information and belief, at all times hereinafter mentioned, defendant, Hartwell Industries, Inc., was and still is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Hartwell, Georgia.

4.     The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## COUNT I

5.      Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 4, inclusive, hereof as though herein set forth in full.

6.      On or about August 17, 2005 defendant entered into an agreement in writing with plaintiff Total Sports Resources, LLC, whereby defendant appointed said plaintiff its buying agent worldwide. A copy of said agreement is annexed hereto and made a part hereof as Exhibit A.

7.      Pursuant to said Buying Agency Agreement, it was agreed that said plaintiff would arrange for vendors to sell goods directly to defendant, in return for which defendant agreed to pay said plaintiff a commission of eight percent (8%) of the invoice price from the vendor to defendant.

8.      Said plaintiff has duly performed all obligations on its part to be performed pursuant to said Buying Agency Agreement.

9.      Defendant has breached the aforesaid agreement in that it has failed to pay commissions to said plaintiff for sales of products delivered and received by defendant.

10.     As a result of the foregoing, said plaintiff has been damaged in the sum of $79,836.77, with interest from April 18, 2007.

11.    Defendant's only stated reason for non-payment is its financial difficulties.

## COUNT II

12.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 4, inclusive, hereof as though herein set forth in full.

13.    On or about December 11, 2005, defendant entered into an agreement in writing with plaintiffs, whereby plaintiffs appointed defendant as their worldwide distributor of co-developed custom athletic apparel products in specified market segments in a defined territory. A copy of said Exclusive Distributor Agreement is annexed hereto and made a part hereof as Exhibit B.

14.    Plaintiff has duly performed all obligations on their part to be performed pursuant to said Exclusive Distributor Agreement.

15.    Defendant has breached the aforesaid agreement in that it has failed to pay $86,450.13 for orders which it cancelled after fabric had been purchased and $275,000.00 for defendant's orders which are ready overseas (consisting of 25,044 pieces of ready goods and 64,452 pieces of uncut goods.)

16.    As a result of the foregoing, plaintiff has been damaged in the sum of $361,450.13, with interest from December 1, 2007.

17.    Defendant's only stated reason for non-payment is its financial difficulties.

## COUNT III

18.    Plaintiff, Total Sports Resources, LLC, repeats and realleges each and every allegation contained in paragraphs 1 through 11, inclusive, hereof as though herein set forth in full.

19.    On or about April 18, 2007, July 30, 2007, August 29, 2007, September 28, 2007, December 3, 2007, December 10, 2007, December 17, 2007, February 20, 2008, April 15, 2008 and May 27, 2008, an account was stated between plaintiff Total Sports Resources, LLC and defendant and upon such statement, a balance of $79,830.77 was found to be due from defendant to plaintiff, which account was delivered, received, accepted and retained by defendant without objection being made thereto or to any item thereof.

20.    No part of the amount due has been paid, and there is now due from defendant to plaintiff, Total Sports Resources, LLC, the sum of $79,830.77, with interest from April 18, 2007.

## COUNT IV

21.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 20, inclusive, hereof as though herein set forth in full.

22.    On or about April 15, 2008 and May 27, 2008, an account was stated between plaintiffs and defendant and upon such statement, a balance of $441,280.90 was found to be due from defendant to plaintiffs, which account was delivered, received, accepted and retained by defendant without objection being made thereto or to any item thereof.

23.    No part of the amount due has been paid, and there is now due from defendant to plaintiffs the sum of $441,280.90, with interest from April 15, 2008.

**WHEREFORE**, plaintiffs request judgment against defendant, as follows:

i.    On Count I, in the sum of $79,836.77, with interest from April 18, 2007;

ii.    On Count II, in the sum of $361,450.13, with interest from December 1, 2007;

iii.    On Count III, in the sum of $79,830.77, with interest from April 18, 2007;

iv.    On Count IV, in the sum of $441,280.90, with interest from April 15, 2008; and

v.    For such other and further relief as the Court may deem just and proper, including the costs and disbursements of this action.

Dated: New York, New York
       June 24, 2008

KALNICK, KLEE & GREEN, LLP

By:    _Allen Green_

Allen Green, Esq. (AG 4246)
Attorneys for Plaintiff
767 Third Avenue
New York, New York 10017
(212) 751-2400

C:\GREEN\FOREIGN\HARTWELL\COMPLAINT 6-23-08.wpd

# EXHIBIT A

# TOTAL SPORTS RESOURCES

500 7TH AVENUE - 5TH FLOOR
NEW YORK, NY 10018
TEL: 212-840-3600
FAX: 212-840-0613

## BUYING AGENCY AGREEMENT

This agreement made this ___8/17/2005_____ by and between __
HARTWELL INDUSTRIES_____ having its principal office at _97_
WINFIELD CIRCLE, HARTWELL, GA 30643_____.
Hereinafter referred to as "Buyer" and TOTAL SPORTS RESOURCES having its
principal office at 500 7TH AVENUE, NEW YORK, NY 10018 hereinafter referred to
as "Agent".

WHEREAS, Buyer desires to continue to engage the services of TOTAL
SPORTS RESOURCES , as its non-exclusive buying agent in certain transactions, and
TOTAL SPORTS RESOURCES desires to act in that capacity.

NOW, THEREFORE, it is agreed that to the extent such services are requested
and thereafter rendered to the Buyer by the Agent, such services shall be rendered strictly
in accordance with the terms of this agreement.

1.    Buyer hereby appoints Agent as its buying agent **worldwide**, effective
with the date written above, to continue until the expiration of thirty days
from the date of mailing by either party to the other at any time, by
registered mail, of notice of cancellation. Agent hereby accepts this
appointment, and agrees to act as same according to the terms and
conditions as set forth in this agreement.

2.    The Agent agrees that with respect to the merchandise to be procured
hereunder it will:

I

TOTAL SPORTS RESOURCES

a.    in no case act as a seller, but on each and every purchase made by the Buyer, will act only as a shipper and Agent;

b.    visit manufacturers in its appointed area, collect samples, submit these samples to the Buyer and shall regularly report to the Buyer the market situation and availability of merchandise and obtain price quotes at which the various items of merchandise which it handles for the buyer can be purchased;

c.    place orders on behalf of the Buyer with manufacturers. The Agent shall maintain contact with such manufacturers, expedite the Buyer's orders, verify that the quantity, quality and condition of the merchandise corresponds to the contract specifications, inspect finished products prior to packing to ascertain that the merchandise meets the specifications, quality and packaging as required in Buyer's purchase order or other duly executed written instructions, and follow-up to make sure that the merchandise is produced and shipped according to schedule;

d.    exercise no control of the price of such merchandise, except to negotiate the lowest possible price for the benefit of the Buyer;

e.    retain evidence in the form of invoices and other receipts from the manufacturers of the merchandise, available to submit to the Buyer immediately upon request, to verify the amounts which are shown on the export invoices;

f.    advise the manufacturers that they will be selling merchandise directly to Buyer and that Agent will be acting as Agent in these transactions; and

g.    buy and hold "quota" on behalf of Buyer for use by Buyer in entering merchandise into the commerce of the United States.

3.    The Agent certifies that it will not furnish to the manufacturers, any dies, molds, patterns, art work, printing plates, engineering work, labor, financial assistance or otherwise assist in production of the goods without the advance approval of the Buyer, so that the cost of such items may be fully and properly disclosed on the invoice covering the purchased merchandise.

## TOTAL SPORTS RESOURCES

4. The Agent in executing this agreement certifies that it has no ownership interest in, or any control of, or any financial interest in factories making the commodities, goods or merchandise, and shall not share its commissions paid by the Buyer hereunder with any manufacturer and shall not receive or accept any remuneration from and manufacturer with which Agent deals on behalf of Buyer.

5. Agent shall be responsible for all expenses incurred in connection with the performance of its services hereunder, including, by way of example, telephone expenses, rental expenses, and any other sales, advertising, promotional or operational expenses.

6. The Agent shall sign a certificate of inspection confirming that the merchandise identified on the invoice(s) for each shipment was personally examined by the Agent while in process and was produced by the manufacturer at the address and country shown on the shipping documents.

7. Agent represents to Buyer that Agent is serving as a buying agent pursuant to this agreement and Agent is not functioning as a principal; Agent further represents that the aforesaid "buying commission" is a true commission and the Agent shall not take any action, the effect of which would be to result in such buying commission being or becoming part of the dutiable cost of the goods purchased by Buyer with Agent's assistance as herein provided. Agent shall indemnify Buyer against expenses and liabilities incurred by Buyer on account of any misrepresentation or default by Agent under the provisions of the preceding sentence.

8. In consideration of such services as may from time to time be provide to the Buyer by the Agent, the Buyer agrees:

   a. To pay the Agent _8%_ . This payment shall be separately invoiced by the Agent and shall become payable upon receipt of Agent's invoice. The amount of this commission is subject to change by written mutual agreement.

3

TOTAL SPORTS RESOURCES

b.   To have the full responsibility for disclosing the terms of this
     agreement and the payment of commissions thereunder to the
     appropriate United States Customs authorities.

9.   This agreement constitutes written expression of the oral buying agency
     agreement under which Buyer and Agent have operated in the past.

10.  This Agreement has been executed in accordance with, and shall be
     governed by, the laws of the State of New York, United States of
     America.

HARTWELL
    CORPORATION

By: _____

KUZMOWYCE MICKEL

DIRECTOR OF SOURCING

DATE: 9/1/05

TOTAL SPORTS RESOURCES

JASON KRA, PRESIDENT

DATE: 8/16/05

4

# EXHIBIT B

*Hartwell*

## EXCLUSIVE DISTRIBUTOR AGREEMENT

This Exclusive Distributor Agreement ("Agreement") is entered into as of ~~October~~ *12-11-05* 2005 (the "Effective Date"), by and between **Hartwell Industries, Inc.**, a Delaware corporation, located at 97 Winfield Circle, Hartwell, Georgia 30643 ("Hartwell"), and **Total Sports Resources**, a division of **Foreign Resources Corporation**, a _____ corporation with offices located at 500 7th Ave 5th floor New York, NY 10018 (the "Company").

## RECITALS

WHEREAS, Hartwell purchases and resells promotional products manufactured by various companies to its customers;

WHEREAS, Company, a manufacturer of athletic apparel, desires to manufacture athletic apparel that will be designed to Hartwell specifications and marketed by Hartwell;

WHEREAS, Hartwell has the capacity to decorate the manufactured athletic apparel according to the needs of its customers; and

WHEREAS, Company desires that Hartwell customize, market and resell the manufactured athletic apparel pursuant to the terms of this Agreement.

## AGREEMENT

NOW, THEREFORE, based on the foregoing and the terms and conditions set forth in this Agreement, the parties agree as follows:

1. <u>Incorporation of Recitals</u>. The recitals stated above are hereby incorporated into this Agreement.

2. <u>Exclusive Development and Appointment</u>. Company appoints Hartwell as Company's exclusive distributor of co-developed athletic apparel products in the following market segments in the Territory: (i) independent sporting goods retailers and team wholesalers; (ii) corporate uniforms; (iii) independent embroiders and decorators; (iv) specialty industry accounts; and (v) regional wholesalers and distributors. "Territory" means the United States of America, including any territories of the United States and any branch of the United States military wherever located. Company will make available exclusively to Hartwell the product mutually developed by Company and Hartwell according to Hartwell's specifications that are listed in Exhibit "A" to this Agreement (the "Products"), as such Exhibit may be amended from time to time by the mutual written agreement of the parties. In such capacity, Company will act and function as Hartwell's buying agent for raw materials and supplies for the Products.

3.    Acceptance. Hartwell accepts the appointment to sell the Products within the Territory, subject to the terms of this Agreement.

4.    Term. Unless terminated as hereinafter provided, the Agreement and the appointment of Hartwell hereunder will commence on the Effective Date and will continue for a period of three years (the "Initial Term"). Upon expiration of the Initial Term, Hartwell will have the option to extend this Agreement for additional one-year periods (each, a "Renewal Term") by providing written notice of Hartwell's election to renew this Agreement no less than sixty days prior to the expiration of the Initial Term or the then-current Renewal Term. As used in this Agreement, "Term" means the Initial Term and any Renewal Terms.

5.    Acceptance of Orders; Filling. All orders will be placed directly with Company, either through Company's EDI ordering system or as otherwise directed by the Company. Company will use commercially reasonable efforts to fulfill Hartwell's order prior to the fulfillment deadline agreed to by the parties at the time of such order. Notwithstanding the foregoing, Company will use commercially reasonable efforts to fulfill the accepted orders as promptly as practicable, subject, however, to delays caused by transportation conditions, labor or material shortages, strikes, riots, fires, supplier delays or any other cause beyond Company's control. In all cases, and without limitation of any of Hartwell's rights and remedies, Company will advise Hartwell in advance (i) if any Products are unavailable for delivery within the fulfillment period set forth herein; or (ii) of any inability to make full and timely delivery of any Products that Hartwell has previously ordered.

6.    Pricing and Payment.

(a)    Hartwell will pay Company for its Products according to the schedule of prices included in Exhibit "A" to this Agreement. Company will do all that is within its power to hold the prices set forth in Exhibit "A" for a minimum of one year from the Effective Date. Thereafter, company shall make all effort to hold agreed prices for twelve month periods beginning with the initial purchase orders for the upcoming year. Price increases must be communicated before the acceptance of affected purchase orders.

(b)    Hartwell will issue international letters of credits for all shipments and will be invoiced by the factories upon delivery to Hartwell's freight forwarder. Company shall act as buying agent for Hartwell and Company will be compensated at a commission rate of 8% of the FOB factory price. Payment by Hartwell to Company is due 45 days from the date of the invoice. Commission rates per product are detailed on Exhibit "A".

(c) Parties agree to discuss and consider wire transfer payment for future orders.

BRMFSLA 58041v3

7.    Sale and Promotion of the Products.

    (a)    Marketing/Promotion.  Hartwell will use commercially reasonable efforts to promote demand for the Products within the Territory.

    (b)    Customization.  Company acknowledges and agrees that Hartwell may decorate all Products by embroidering, attaching or otherwise affixing its customers' logos or other artwork or decoration prior to shipping to any Hartwell customer, and for such purposes and subject to the terms herein, Company grants to Hartwell a license to so modify the Products, provided that in no event will Company's name, logo or trademark be removed, covered, hidden or otherwise altered, without Company's prior consent.

    (c)    End-Customer Pricing.  Hartwell may determine its own pricing for the Products when reselling the Products to its customers.

    (d)    Product Availability.  Company will make certain that the Products are available to Hartwell for purchase under the terms hereof for a minimum of 1 year from the Effective Date (or from the date such Product becomes available for purchase under this Agreement, for any Products that are added at a later date), in quantities as determined by mutual agreement.

    (e)    Samples.  As soon as practicable following the Effective Date, Company will provide to Hartwell at no charge initial selection samples of Products as follows: (i) a minimum of 3 units of each style and color (one size) for new product review; and (ii) 1 unit of each style and color (one size) for photography samples.  For each additional Product added to this Agreement during the Term, Company will provide Hartwell with the same number of samples at no additional charge.  Hartwell may purchase additional samples of any Products at a price not to exceed twice the cost of Company's FOB cost.

8.    Trademark Rights.

    (a)    During the Term and subject to the provisions of this Agreement, Company grants Hartwell a non-exclusive, royalty-free license to use, copy and display the Company trademark **Agame** ("Company Trademark") in connection with the branded label to be used exclusively by Hartwell: "Agame by Hartwell Athletic" (the "Branded Label") for the promotion, sale and distribution of the Products.

    (b)    Company represents and warrants to Hartwell that it has: (i) the legal right to use the Company Trademark; (ii) the right to grant Hartwell the right to use the Company Trademark in connection with the Branded Label as contemplated by this Agreement; and (iii) the full power, right and authority to enter into this Agreement and perform its obligations in connection herewith.  Company will indemnify Hartwell for any breach of Company's representations and warranties contained herein in accordance with Section 13.

(c)    Upon the expiration or earlier termination of this Agreement, Hartwell will discontinue use of Company Trademarks by the date all remaining Products are sold pursuant to Section 11(d), below.

(d)    Company retains all right, title and interest, including all copyright, patent, trade secret, trademark, and any other intellectual property rights, in and to Company's Products or Company Trademarks, including all updates, derivative works and modifications thereto (other than the modifications permitted hereunder for decoration purposes). Hartwell will gain no right, title or interest in Company Products or Company Trademarks by virtue of this license, other than the non-exclusive license granted hereunder.

(e)    Company has no right to use, copy or display any Hartwell trademarks apart from the limited right to manufacture and label products under the Branded Label for use by Hartwell as provided for in this Agreement.

9.    Quality Standards.  Hartwell will notify the Company of any claims for defective merchandise in writing. Company agrees to adhere to AQL 4.0 standards. Deposition of credited defective goods shall be at the discretion of the factory of origin.

10.    Shipment: Title.  Shipping will be FOB from Hartwell's designated freight forwarder. Hartwell will be the importer of record. Title and risk of Loss will pass to Hartwell upon delivery to Hartwell's freight forwarder. Company will bear all costs of shipping and handling to Hartwell's designated freight forwarder and Company will maintain adequate insurance at least equal to Hartwell's purchase price of Products and will maintain adequate insurance for all risks as are customary in the industry, including risk of damage to the Products. Hartwell will bear all costs of shipping and handling from Hartwell's designated freight forwarder to its warehouse.

11.    Default/Termination.

(a)    Either party may terminate this Agreement if the other party breaches any material covenant, representation or warranty of this Agreement and such breach remains uncured 30 days following receipt of written notice from the non-breaching party.

(b)    Hartwell may terminate this Agreement upon thirty days prior written notice to Company in the event that Hartwell elects to discontinue offering the Products in Hartwell's then-current catalog for similar products.

(c)    In the event of termination, this Agreement will remain applicable to any orders for Products which Hartwell has placed and which Company has accepted prior to the effective date of termination.

4

(d)    In the event of termination or expiration of this Agreement, Hartwell may sell any remaining Products in its possession or control in accordance with the terms of this Agreement. Company will, at the request of Hartwell, provide Hartwell with reasonable assistance in selling off remaining inventory.

12.    Confidentiality.

(a)    Confidential Information. Either party (the "Receiving Party") may be exposed to or acquire information regarding the business, projects, operations, finances, activities, affairs, research, development, products, technology, technology architecture, business models, business plans, business processes, marketing and sales plans, customers, finances, personnel data, computer hardware and software, computer systems and programs, processing techniques and generated outputs, intellectual property, procurement processes or strategies, suppliers, or customers of the other party (the "Disclosing Party") or its or their respective directors, officers, employees, agents, suppliers, licensors or clients, including, without limitation, any idea, proposal, plan, procedure, technique, formula, technology, or method of operation (collectively, "Confidential Information"). Confidential Information will also include, without limitation, the terms and conditions of this Agreement.

(b)    Restrictions.    The Receiving Party agrees to hold the Disclosing Party's Confidential Information in strict confidence, to use such information for no purpose other than as necessary for the performance of its obligations and the exercise of its rights in accordance with this Agreement, and to make no disclosure of such information except in accordance with the terms of this Agreement.  Each party hereby consents to the disclosure of its Confidential Information to the employees, officers, directors, agents, lenders, accountants, attorneys and auditors of the other party, and any entity controlling, controlled by or under common control with the other party, who have a need to know such Confidential Information. Each party further agrees to treat all Confidential Information of the other in the same manner as it treats its own confidential and proprietary information of similar sensitivity, but in no case will the degree of care be less than reasonable care. The Receiving Party will immediately advise the Disclosing Party of any actual or potential violation of the terms of this Section, and will reasonably cooperate with the Disclosing Party in relation thereto.

5

(c)  Exceptions.  Notwithstanding the foregoing, each party's confidentiality obligations hereunder will not apply to information which: (a) becomes publicly available without fault of the Receiving Party; (b) is rightfully obtained by the Receiving Party from a third party without restriction as to disclosure, or is approved for release by written authorization of the Disclosing Party; (c) is shown by written record to be developed independently by either party without use of the other party's Confidential Information; (d) is shown by written record to have been known or available to either party without restriction as to disclosure at the time of either party's receipt of such information; or (e) is required to be disclosed by law.  If either party receives a subpoena or other validly issued judicial process requesting, or is otherwise required by a government agency to disclose Confidential Information of the Disclosing Party, then the Receiving Party will promptly notify the disclosing party of such requirement, and before making any such required disclosure, will reasonably cooperate to seek confidential treatment or to obtain an appropriate protective order to preserve the confidentiality of the Confidential Information.

(d)  Injunctive Relief; Survival of Obligations.  The parties agree that, notwithstanding any other section of this Agreement, in the event of a breach or threatened breach of this Section, the non-breaching party will be entitled to seek equitable relief to protect its interests, including but not limited to preliminary and permanent injunctive relief, as well as money damages. Nothing stated herein will be construed to limit any other remedies available to the parties. All obligations under this Section will survive for three years following the expiration or earlier termination of this Agreement.

13.  Representations and Warranties; Acknowledgement; Disclaimer.

(a)  General Representations and Warranties.  Each of the parties represents and warrants to other party that (i) it has the right, power and authority to enter into this Agreement; (ii) the execution, delivery and performance of this Agreement have been duly authorized and approved by it; (iii) this Agreement is a valid and binding agreement by it enforceable in accordance with its terms; and (iv) the individual signing this Agreement on its behalf has full authority to sign the Agreement and to bind it fully to the Agreement.

(b)  Company Representations and Warranties.  COMPANY REPRESENTS AND WARRANTS THAT ALL THE PRODUCTS IT SUPPLIES TO HARTWELL: (I) WILL BE MERCHANTABLE AND FIT FOR THEIR INTENDED PURPOSES AND ARE FREE FROM DEFECTS IN DESIGN, MATERIALS OR WORKMANSHIP; (II) WILL BE MANUFACTURED, MARKED AND PACKAGED IN CONFORMITY WITH ALL APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS; (III) DO NOT AND WILL NOT INFRINGE THE INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY; (IV) HAVE NOT BEEN MANUFACTURED USING CHILD LABOR OR PRISON LABOR; AND (V) CONFORM IN ALL MATERIAL RESPECTS TO THE SAMPLES OF SUCH PRODUCTS PROVIDED TO HARTWELL.

14.  Limitations of Liability.

BRMFSLA 58041v3

(a)    NO CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOST PROFITS OR FOR ANY OTHER INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, OCCASIONED BY ANY BREACH UNDER THIS AGREEMENT OR ANY OTHER CAUSE WHATSOEVER, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)    LIMIT ON DIRECT DAMAGES.  IN NO EVENT WILL COMPANY'S LIABILITY TO HARTWELL FOR DIRECT DAMAGES UNDER THIS AGREEMENT EXCEED THE AMOUNTS PAID TO IT HEREUNDER.  IN NO EVENT WILL HARTWELL'S LIABILITY TO COMPANY FOR DIRECT DAMAGES UNDER THIS AGREEMENT EXCEED THE AMOUNTS OWED BY IT TO COMPANY HEREUNDER.

(c)    EXCEPTIONS TO LIMITATIONS OF LIABILITY. THE LIMITATIONS OF LIABILITY IN THIS SECTION 14 WILL NOT APPLY TO A BREACH OF A PARTY'S (I) INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, OR (II) CONFIDENTIALITY OBLIGATIONS UNDER SECTION 12.

15.    Company Indemnification. Company will indemnify, defend and hold Hartwell harmless from and against any third party claims, losses, demands, expenses or damages, of any kind or nature, arising from or related to (i) any breach by Company of any representation, warranty, covenant or obligation under this Agreement or (ii) Hartwell's use of the Products as contemplated under this Agreement; provided that Hartwell promptly notifies Company in writing of any such claim, promptly tenders the control of the defense and settlement of any such claim to Company (at Company's expense and with its choice of counsel), and cooperates fully with Company (at Company's reasonable request and expense) in defending or settling such claim, including but not limited to providing any information or materials reasonably necessary for Company to perform the foregoing.  Company will not enter into any settlement or compromise of any such claim without Hartwell's prior consent, which will not be unreasonably withheld.

16.    Governing Law; Jurisdiction. This Agreement, and all the rights and duties of the parties arising from or relating in any way to the subject matter hereof, will be governed by, construed and enforced in accordance with, the laws of the State of Georgia, without regard to the choice of law or like rules of Georgia or any other jurisdiction.

17.    Proceedings. Any dispute, controversy, or other proceedings arising out of or related to this Agreement, will be subject to the exclusive jurisdiction of the state and federal courts located in Atlanta, Georgia, and the parties hereby submit to the personal jurisdiction and venue of such courts.

7

18.  Miscellaneous.

(a)  Independent Contractors.  The relationship of the parties hereto is that of independent contractors. Nothing contained in this Agreement will be construed as creating a joint venture, agency, employment, or partnership relationship among the parties hereto nor will any party have the right, power, or authority to create any obligation or duty, express or implied, on behalf of any other party.

(b)  Binding; Assignment Limitations.  This Agreement will be binding on and inure to the benefit of each party hereto and such party's respective subsidiaries and affiliates, successors, and assigns. Either party may assign this Agreement, without the prior consent of the other party, to any entity that succeeds it by operation of law or via a change in material control.

(c)  Further Assurances.  Each party hereto agrees to execute and deliver any and all further documents, and to perform such other acts, as may be necessary or expedient to carry out and make effective this Agreement.

(d)  Waiver.  No delay on the part of any party in exercising any right, power, or privilege hereunder will operate as a waiver thereof, nor will any waiver on the part of any party of any right hereunder, nor any single or partial exercise of any rights hereunder, preclude any other or further exercise thereof or the exercise of any other right hereunder.

(e)  Force Majeure.  Neither party will be liable hereunder by reason of any failure or delay in the performance of its obligations (except for the payment of money) on account of strikes, shortages, riots, insurrection, terrorism, fires, flood, storm, explosions, earthquakes, Internet outages, acts of God, war, governmental action, or any other similar cause that is beyond the reasonable control of such party.

(f)  Notices.  Any notices to be given hereunder by either party to the other will be in writing and may be transmitted by personal delivery or by mail, registered or certified, postage prepaid with return receipt requested. Notices will be addressed to the parties at the addresses first written above, unless written notice in accordance with this Section is given changing that address. Notices delivered personally will be deemed communicated as of the date of actual receipt; mailed notices will be deemed communicated as of the third day following the date of postmark.

(g)  Modifications.  Any modification of this agreement will be effective only if it is in writing and signed by the party to be charged. No terms, provisions or conditions of any purchase order or other business form or written authorization used by a party, if any, will have any effect on the rights, duties or obligations of the parties hereto or otherwise modify this Agreement, regardless of any failure of either party to object thereto.

8

(h)    Effect of Waiver. The failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this Agreement by the other party will not be deemed a waiver of that term, covenant, or condition, nor will any waiver or relinquishment of any right or power at any one time or times be deemed a waiver or relinquishment of that right or power for all or any other times.

(i)    Severability. Each term, covenant, condition, or provision of this Agreement will be viewed as separate and distinct, and in the event that any such term, covenant, condition or provision will be deemed by an arbitrator or a court of competent jurisdiction to be invalid or unenforceable, the court or arbitrator finding such invalidity or unenforceability will modify or reform this Agreement to give as much effect as possible to the terms and provisions of this Agreement. Any term or provision which cannot be so modified or reformed will be deleted and the remaining terms and provisions will continue in full force and effect.

(j)    Equal Construction. Every provision of this Agreement is the result of full negotiations between the parties, both of whom have either been represented by counsel throughout or otherwise been given an opportunity to seek the aid of counsel. Each party hereto further agrees and acknowledges that it is sophisticated in legal affairs and has reviewed the Agreement in detail. Accordingly, this Agreement will not be construed for or against either party. Each party hereby waives any right it may otherwise possess to have any provision of this Agreement interpreted to its advantage.

(k)    Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original hereof and all of which together will constitute one and the same instrument.

(l)    Entire Agreement.    This Agreement, including Exhibits attached hereto, constitutes the complete and exclusive statement of agreement between the parties and supersedes all prior agreements, understandings and communication of any kind by and between the parties, whether written or oral, with respect to the subject matter hereof.  This Agreement may be amended, modified, superseded, or cancelled, and the terms and conditions hereof may be waived only by a written instrument signed by the parties hereto or, in the case of a waiver, by the party waiving compliance.

9

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

Hartwell Industries, Inc.

By: _____

Its: _V.P. Sales Hartwell dith (tic_

Address:

97 Winfield Circle
Hartwell, GA 30643
Phone: 706 - 856 - 4204
Fax: 706 - 856 - 4139

Foreign Resources Corporation

By: _____

Its: _JASON KEN / OWNER_

Address:

c/o Total Sports Resources
500 7th Ave 5th FL
New York NY 10018
Phone: (212) 840-3600
Fax: (212) 840-0603

10

# Exhibit B

# HARTWELL

October 26, 2006

Re: Stock Fabric for A GAME Program

   Total Sports Resources agrees to keep on hand in the manufacturing facility, fabric sufficient to support the timely delivery of A GAME ATHLETIC stock product to Hartwell Industries. The type, colors and amount of fabric to be stocked in factory will be determined by Hartwell Industries. The factory will continually replenish the fabric inventory to levels indicated by Hartwell Industries until otherwise notified by Hartwell Industries.

   Hartwell Industries agrees to use / purchase the fabric held in inventory and in the event of termination of the program Hartwell Industries agrees to use / purchase any leftover stock fabric within 90 days of program termination. Hartwell Industries' liability for stocked fabric is only equal to the amount of fabric specified by Hartwell to be kept on hand in factory.

HARTWELL

Date    10/30/06

# Exhibit C

**JERRY CHICHELO**

From:          JERRY CHICHELO
Sent:          Monday, July 28, 2008 11:56 AM
To:            'Allen Green'
Subject:       FW: Doneger

From: Rick Cesere [mailto:rcesere@hartwell.com]
Sent: Wednesday, December 05, 2007 9:06 AM
To: JERRY CHICHELO
Subject: RE: Doneger

Jerry, I will check with Rob but my last discussion with him was he was arranging additional payments. We are very tight right now because the season has been a bit of a dud and we have too much inventory and Patriarch is holding us to the fire. No problem, just a several week crunch. It is not that we do not want to clear this up quickly. I am sorry for the delay.

Rick Cesere
CEO

Hartwell Industries
706-856-4469 office
706-856-4139 fax
706-436-6422 cell

The information contained in this message may be privileged, confidential, and protected from disclosure. If you are not the intended recipient, or an employee, or agent responsible for delivering this message to the intended recipient, you are hereby notified that dissemination, distribution, or copying of this message is strictly prohibited.

If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Opinions, conclusions and other information in this message that do not relate to official Hartwell Apparel business are those of the sender and are neither given nor endorsed by any of the aforementioned companies.

-----Original Message-----
From: JERRY CHICHELO [mailto:JCHICHELO@Totalsportsresources.com]
Sent: Wednesday, December 05, 2007 8:47 AM
To: Rick Cesere
Subject: RE: Doneger

Rick,

        Any update on liability, I have emialed Rob numerous times and no response .

Thank you

From: JERRY CHICHELO
Sent: Wed 11/28/2007 11:46 AM
To: Rick Cesere
Subject: RE: Doneger

1

I have given all info to Rob so please let me know when we will be receiving so I can let overseas office know.

Thank you.

---

**From:** Rick Cesere [mailto:rcesere@hartwell.com]
**Sent:** Wednesday, November 28, 2007 11:39 AM
**To:** JERRY CHICHELO
**Subject:** RE: Doneger

Jerry,

That is great, thanks on the Doneger. We will be sending you another payment on the liability very soon.

Rick Cesere
CEO

Hartwell Industries
706-856-4469 office
706-856-4139 fax
706-436-6422 cell

The information contained in this message may be privileged, confidential, and protected from disclosure. If you are not the intended recipient, or an employee, or agent responsible for delivering this message to the intended recipient, you are hereby notified that dissemination, distribution, or copying of this message is strictly prohibited.

If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Opinions, conclusions and other information in this message that do not relate to official Hartwell Apparel business are those of the sender and are neither given nor endorsed by any of the aforementioned companies.

# Exhibit D

**From:** Kevin McColgan [mailto:kmccolgan@hartwell.com]
**Sent:** Fr Case 1:08-cv-05865-MGC, Document 8
**To:** JASON KRA; JERRY CHICHELO
**Cc:** 'Rob Davies'
**Subject:** RE: TSR/FRC MEEYING

Jason,

Sorry for the delay , but we are working through all the details. In addition, like the entire market we are experiencing a significant softening in demand due to the economy. Due to this we are over inventoried across a number of our product lines. As we have done with our other vendors in this position, we will be forwarding you an excess inventory list of product that we will need to return to you.

Regarding your commission, I'm very confused. Why would we owe you a commission on product we have purchased from your company. However I will touch base with Rob on this matter.

Regards,

Kevin


**m:** JASON KRA [mailto:JKRA@FRCNY.NET]
**Sent:** Thursday, February 14, 2008 10:51 PM
**To:** JERRY CHICHELO; Kevin McColgan
**Subject:** RE: TSR/FRC MEEYING

Kevin

Hello and I hope this finds you well. Since we visited your place we have not heard anything from your team to settle all the issues. There is nothing pending from our side for all and we would like to clean all up. Also we forgot to discuss when we visited that our entire year 2007 commission was never paid and is outstanding for old business. Thanks for your help in addressing all issues

Regards
Jason Kra
FRC


8/5/2008

# Exhibit E

**SENDER: COMPLETE THIS SECTION**

Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
Print your name and address on the reverse
so that we can return the card to you.
Attach this card to the back of the mailpiece,
or on the front if space permits.

1. Article Addressed to: LYNN TILTON

Patriarch Partners, L
37 Avenue of the Am
17th Fl
New York, NY 10013

Contact ADDR

2. Article Numl
(Transfer from    7006 2150

PS Form 3811, February 2004

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Mendel                          ☐ Agent
                                  ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
Y Kendel                          4-1

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

**H**

**Kevin McColgan**
President / CEO

phone · 706-856-4900
cell · 847-340-7530
email · kmccolgan@hartwell.com

**Hartwell**
A P P A R E L
www.hartwell.com

97 winfield circle
hartwell, GA  30643



500 7th Avenue, 5th Floor
New York, NY 10018
tel (212) 840-3600 • fax (212) 840-0613

Date: April 15, 2008

Ms. Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
40 Wall St Frnt
New York, NY 10005

CC: Kevin McColgan

RE: Hartwell Apparel

Ms. Tilton

FRC, Incorporated is a New York City based private label company (profile attached) that has worked to build a solid relationship with Hartwell Apparel since 2005. We have been producing athletic wear for Hartwell under two set programs; 1) Basics, and 2) Basketball under the "A Game" athletic label produced exclusively for Hartwell.

I understand your esteemed firm owns a significant stake in Hartwell. The reason I am reaching out to you is for advice on how to resolve payment of outstanding commissions earned, as well as escalating liable issues that need to be addressed. This letter requires your immediate attention or FRC is left with no option other than to pursue all legal options to collect on Hartwell's obligations to FRC. I have tried on numerous occasions to communicate with Hartwell's CEO Kevin McColgan and would like to settle this, but he has chosen to ignore my efforts. Issues requiring immediate attention are as follows:

1)      Hartwell owes FRC commission of $79,830.77 on delivered product received and approved by Hartwell of which 78% is between 180-365 days past due (see commission attachment).

2)      Hartwell owes FRC for cancellation liability of $111,450.13 for product Hartwell approved and ordered under the Cambodia Basic program and Egypt Basketball program (see cancellation attachments). Both orders were cancelled, which is in Hartwell's right under the cancellation liability terms of the agreement, but with termination penalties. With both orders the fabric was already purchased and in place at our manufacturer. The Basic program was already confirmed for payment by Hartwell and FRC received $25,000 so far towards the total above from Hartwell leaving the balance at 86,450.13. Rick Cesere, Hartwell's former CEO, stated in a November 12th meeting at our NYC office that Hartwell would uphold its obligation and issue payment for a total sum of $85,000 which includes the 25,000 sent , and then work out the remainder in Outerwear orders for fall 08. Mr. Cesere said he notified Hartwell's CFO, Mr. Rob Davies of the terms of the settlement.

3)      Hartwell presently has 31,368 pieces of exclusive "A Game" Hartwell styles in Cambodia ready to ship since December. This is based on Hartwell orders plus they have another 59,424 pieces where the fabric is in the factory ready to be made, according to their orders estimated total of 300,000 (see

*outstanding order attachment)*. Additionally some of the uncut goods are fabric that Hartwell asked us to stock since fall 2006 and replenish in order to achieve quicker turns *(see stocked fabric agreement)*.

FRC is a contracted buying agent and manufactures custom product based on Hartwell's orders commitments. FRC has an exclusive contract and buying agency agreement for "*A Game*" by Hartwell which is signed by Hartwell *(see attachments)*. FRC is a FOB made to order company, which means we are not an importer, and FRC does not run warehouse merchandise.

FRC visited Hartwell on January 31, 2008 to introduce ourselves to Kevin McColgan in order to go over our company and its ongoing athletic programs. During this meeting we also were going to review the 18 sampled styles of outerwear FRC was asked to develop from an early meeting on November 12th, 2007 attended by Rick Cesere and Rhonda Johnson, Director of Merchandise. Delivery for this order was anticipated for the fall of 2008.

Mr. McColgan had mentioned that Hartwell's business model going forward was that all manufacturers would warehouse product. We took this chance to reiterate that FRC does not warehouse merchandise for any of our clients. We told Mr. McColgan we respect his decision and if there was anything Hartwell needed developed then FRC would like to continue our relationship. At the conclusion of our meeting Mr. McColgan, as the senior officer of Hartwell, assured FRC each of the above mentioned outstanding issues will be taken care of in a timely manner. In an effort to expedite payment of the outstanding debt Mr. McColgan, requested that FRC send Hartwell information pertaining to the fabric liability for the basketball program (Egypt), which we did promptly.

On February 1st, 2008 I sent Mr. McColgan an email recap of our meeting and inquired when FRC can expect to be paid in accordance to the terms agreed by all parties during our meeting. Mr. McColgan responded with a one sentence email on February 15th stating he wants FRC to take back all the merchandise Hartwell ordered last year and then followed up saying Hartwell is experiencing a significant softening in demand due to the economy and over inventoried. Nothing was mentioned about this option in our meeting. Additionally, Hartwell does not have the right to demand FRC to take back merchandise ordered by Hartwell, which is clearly explained in our buying agreements.

Since receiving Mr. McColgan's email I have called Hartwell and sent email numerous times and never received the professional courtesy of a reply. I even offered to fly down to Hartwell again so we can settle this matter face to face.

Mr. McColgan's behavior is unprincipled particularly since FRC has been a fine resource tool and partner to Hartwell. FRC has directed Hartwell to top management at leading retailers and even set up meetings for Hartwell with preferential retail clients of ours in order to assist Hartwell in distributing their full product line. To further demonstrate our prior commitment to Hartwell, letters of credit for product ordered are typically opened 60 days prior to ship date. This requirement has never been completed by Hartwell, but FRC has always continued with production once an order was placed by Hartwell.

It is unfortunate I have to address this issue with you but as you may imagine FRC has serviced and fulfilled our agreement for Hartwell and provided an open channel of communication to resolve disputes or Hartwell's financial constraints. Although, please don't misinterpret our willingness to resolve this issue with Hartwell as an indication of patience. As previously mention, FRC will shortly pursue another course of action to collect Hartwell's outstanding debt.

I look forward to your response and how we should proceed and getting this all settled.

Regards,

Jerry Chichelo

# Exhibit F

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

5-27-08

Sent To  HARTWP//

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

7005 3110 0002 0140 9597

PS Form 3800, June 2002    See Reverse for Instructions

# KALNICK KLEE & GREEN, LLP

COUNSELORS AT LAW

767 THIRD AVENUE

NEW YORK, NEW YORK 10017-2023

TEL: (212) 751-2400

FAX: (212) 751-3175

WEST COAST OFFICE
9595 SANTA MONICA BOULEVARD
BEVERLY HILLS, CALIF. 90210
TEL: (310) 274-6683
FAX: (310) 859-7743
KALISCH, COTUGNO & RUST, COUNSEL

LONG ISLAND OFFICE
100 JERICHO QUADRANGLE
JERICHO, NEW YORK 11753
TEL: (516) 942-5300
FAX: (516) 932-6050

May 27, 2008

**Via Certified Mail:rrr**

Hartwell Industries, Inc.
97 Winfield Circle
Hartwell, Georgia 30643
Attn: Kevin McColgan

Re:    Foreign Resources Corporation with Hartwell Industries, Inc.

Dear Mr. McColgan:

We are attorneys for Foreign Resources Corporation and its division, Total Sports Resources, LLC.  Reference is made to the Buying Agency Agreement dated August 17, 2005 with Hartwell Industries, Inc. ("Hartwell") and the Exclusive Distributor Agreement dated December 11, 2005, also with Hartwell.

We have been informed that Hartwell owes our clients a total of $441,280.90.  Our client's efforts to obtain payment have, unfortunately, produced minimal results, thus necessitating the retention of our firm.  While our clients have attempted to work with you, financial difficulties on your part do not constitute an excuse for non-payment.

The aforesaid sum consists of $79,830.77 for commissions, $86,450.13 for cancelled orders and $275,000.00 for Hartwell's existing orders which are ready overseas (consisting of 25,044 pieces of ready goods and 64,452 pieces of uncut goods).  Should our client be compelled to institute litigation to recover these sums, interest and court costs will also be owing.

We urge you to make immediate arrangements for payment of all sums owing to our clients within ten (10) days from the date hereof.  If we do not hear from you within this period, we shall have no alternative but to pursue all appropriate legal remedies.

Very truly yours,

Kalnick Klee & Green LLP

By: _____
Allen Green